We are ready now to get started in our second case, Morrow v. Navy Federal Credit Union. Ms. Gold for the appellant. Yes, Your Honor. Thank you. May I take off my mask? Certainly. Do you have your little thing on the microphone? Yes. The cover, I mean. When a consumer shops online on what appears to be an American website with prices displayed in U.S. dollars, she reasonably believes her transaction to be made in the United States. The question in this case is whether Navy Federal may nevertheless assess a foreign transaction fee on that purchase, and the answer turns on Navy Federal's contract language. Counsel, I'm sorry. I hate to interrupt at the very beginning, but is the legal rule, does the legal rule that you are arguing for turn on what the website looks like, whether the merchandise is being priced in U.S. dollars? I mean, is any of that relevant to your legal argument? The legal argument turns on the contract language, but I believe it's important background here in terms of consumers' experiences and how they view the contract and how they... That's fine. It was a genuine question. So you are not saying that, for instance, in deciding how this contract language applies, it would matter whether the merchandise was advertised in U.S. dollars or not? No, Your Honor. Okay. Navy Federal's contract says it will only assess foreign transaction fees on point-of-sale transactions made in foreign countries. And in the briefs, the parties go back and forth on where these transactions should be legally considered made, with both parties citing the UCC and various choice-of-law principles. And while we believe the case law to be decisively in our favor on those issues, the question in this case is not actually about the UCC or about choice-of-law. It's about how a reasonable consumer would understand Navy Federal's contract language. And the answer... And are you saying that the point-of-sale has to be at a retailer's physical location? We believe the transactions are made in the United States because that's where the purchaser is located. In fact, the point-of-sale could be many different places. It could be where the merchant is located. It could be where the product is shipped from, which is what... So do you agree that a transaction is made where the offer is accepted? Yes, Your Honor. I do. Do you think the offer was accepted here in the United States by the purchaser rather than by the seller? Absolutely, Your Honor. So what about Virginia law that says otherwise? Virginia Supreme Court law is clear on that issue. It's the Chang v. First Colonial Savings Bank case. It explains that when an advertisement is clear and definite and there's no negotiation, that advertisement is an offer. What about J.B. Moore and that line of cases? I believe that line of cases is referring to a commercial transaction in which there's an actual negotiation between the parties. Counsel, you started by saying we want to know what a reasonable consumer would think this language means. Are you suggesting that to figure out what this language means, what a reasonable consumer should do is look up Virginia law, apply what you even, as you just said, it sounded like an incredibly fact-intensive and complicated analysis and try to figure out where this contract was formed? I can't remember. Or was it where the offer was accepted? I mean, how does that work? Absolutely not, Your Honor. And I think that highlights the ambiguity of this language, that consumers... So you do... I'll finish your answer. I'll follow up on the ambiguity thing. I didn't mean to cut you off. I want you to answer that question. What we need to be evaluating this contract from is from the standpoint of a reasonable consumer. There are multiple interpretations for where a transaction should be made, and a consumer shouldn't necessarily be charged with knowledge of the UCC or choice of law principles. I'm simply saying that even if you were to look at those things, we are legally correct that these transactions are made in the United States and subject to the United States law. So when judges would apply United States law to this transaction, of course it's reasonable for a consumer to also think that these transactions are made in the United States. That has to be a reasonable interpretation. So is your argument that it's ambiguous or it's unambiguous? Certainly when we get to trial, we'll be arguing our interpretation is correct because we should be interpreting this ambiguous language against the drafter. So right now you're saying it's ambiguous and the ambiguity is going to be resolved in your favor? That's our position, yes, Your Honor. And in fact, we have Judge Gergel, that's precisely what Judge Gergel held in the Hart case, when evaluating the exact same language, also under Virginia law, that the contract does not speak with the clarity that Navy Federal describes to it. Did you appeal the claim preclusion aspect of the district court's order? We did not, Your Honor. Navy Federal here has actually put forward three different interpretations of where this transaction is made. They say it's where the merchant is located at one point. They say it's where the product is shipped from at another point. And they also say it's where payment is made. But in the world of global commerce, all three of those places could be entirely different, which highlights the ambiguity. But counsel, what if there are multiple places where you could say this was made, that these transactions were made, including but not limited to the location of the merchant? Then wouldn't the contract language allow for charging the fees? Or is it your view that the contract, you're reading the contract to say, will charge the fees in one place only, and it will be where the transactions are made? What if the transactions are made in several different places? Couldn't they then charge fees when the transaction was made at any one of those places? No, Your Honor. It's the exact opposite. So Navy Federal has a duty to write a clear and unambiguous contract. If its contract is subject to multiple reasonable interpretations, in other words, if you can look at the word made and say that this transaction is reasonably made in the United States, I can understand that position. If you say the transaction is reasonably made where the merchant is located, or if you say the transaction is reasonably made where the product is shipped from, that means that the word made and that this contract is ambiguous. And at this stage, on the pleadings, at a motion to dismiss stage, the motion should be denied when it's subject to multiple competing interpretations and when the plaintiff's interpretation is reasonable. Well, the transaction is made where the offer is accepted, right? We agreed on that earlier, I think. Then you were going to talk about Virginia law that's not J.B. Moore, but another. What case was it you were citing about advertising? Chang v. First Colonial Savings Bank. Is that? Okay, go ahead. Is it in your brief? They brought up this point for the first time last week in the supplemental filing, and we filed a response on Friday. Okay. It was in our response on Friday. All right, I saw that. Yes. And in that case, it was a bank advertisement, and the consumer availed themselves of that advertisement, and the Virginia Supreme Court said that advertisement is clear and definite. There was no negotiation that happened here, so when the consumer accepted that offer, the contract was enforceable. Again, I'm sorry. So if that's the standard we're applying to figure out what made mean, does that mean that maybe federal has to, in every case, find out was there a negotiation over price before it decides whether or not to apply its fee? No, Your Honor, because this is a form contract. It needs to have one uniform interpretation. Right, so I don't understand how that can be the standard. The standard you just read is not going to have one uniform interpretation. Well, certainly in these online purchases, we know how the Internet works, that a consumer clicks buy, and certainly with the plaintiff's transactions, this is at chicme.com and freelancer.com, there was no negotiation. But in any transaction here, we would say the word made is fundamentally ambiguous. And according to a reasonable consumer, that these transactions are reasonably made in the United States. I think I'm not being clear about my question. Every time you tell me about where the law is on where an offer is accepted, I start to sort of struggle with figuring out how, if we say that made means where the offer is accepted, how that is an even remotely manageable standard in this context. It may be that for many Internet transactions, you can be pretty sure that there's no negotiation over price. But in many, many Internet transactions, there is a negotiation over price. And how is Navy Federal supposed to figure out which is which? I mean, is it possible, is it a plausible reading of this contract that Navy Federal will, with respect to every Internet transaction, conduct an inquiry into whether under the governing choice of law and contract principles in Virginia, this one counts as the acceptance of an offer or not? I think this highlights the ambiguity. The fact that this could... It doesn't to me seem to highlight ambiguity. It seems to me to foreclose an interpretation of the contract that would incorporate the legal standard you are describing because it is literally impossible to apply. No one could have possibly intended that. The fact that we don't know where these transactions are made, that various facts would affect that analysis, that different judges would come to different conclusions, that this could be the topic of a law school exam, demonstrates that reasonable consumers shouldn't be expected to understand that they will be charged foreign transaction fees on these. But your position is that what made means in this contract, a transaction is made where the offer was accepted. Is that your position? Yes, Your Honor, and that the word made is inherently ambiguous and that it is impossible to determine where... It's not ambiguous. It's just incredibly hard to figure out. That doesn't make it ambiguous. It just makes it unlikely that anybody would have thought that is the meaning of this term because in each case it will require a multifactored analysis into the details of the transaction. It's their burden to write a contract so that consumers don't have to do the multifactor analysis, so that consumers can look at the fee schedule and say I'm going to be charged a fee on this purchase or I'm not. And the fact that you don't clearly know that from reading this contract, unlike many other banks' contracts, is fundamentally the problem. But it seems like those are two arguments that are different. Made means where the contract is accepted is a position you could advance and we could determine whether that's a reasonable standard. Maybe it's not because it gets into legal stuff and that's not how normal consumers think or would have understood things. But made is an ambiguous word is a different argument, it seems to me, based on what you're talking about. Maybe I'm not understanding your argument when it says on the one hand it's where it's accepted and on the other hand where it's ambiguous. It just seems those don't go together. Our view is that the word made is ambiguous and the fact that we can go back and forth with various legal principles, various hypotheticals, various factual scenarios, proves that the term is itself ambiguous. This is one principle that supports the ambiguity. Counsel, I want to switch from made to point of sale. Yes. And this is probably an unfair question because it's not in your brace and I'm not holding it against you. But are you familiar with the concept or the discipline or interpretive tool of corpus linguistics? I don't think I am, Your Honor. Okay, that's completely fine. Again, with the term point of sale, both the dictionary definition of the term and the legal interpretation of the term have construed point of sale to mean a physical checkout counter and not necessarily to encompass an online transaction. And when you use these two words together, point of sale transactions made in foreign countries, you're reasonably promising to only assess fees when the account holder is physically swiping their card abroad. It seems to me your argument is better that there's ambiguity when the focus is on the agreement document, the one-page agreement document that says made in a foreign country. I kind of get the notion that maybe people can interpret that different ways. But when you say point of sale is part of the contract, which you allege to be the case, and I understand you argue that means the buyer must be physically present, but the focus there seems to be on the sale. It seems like point of sale cuts in favor of resolving any otherwise ambiguity in favor of the seller. Well, I would just quote to you the Seventh Circuit in response. They asked this question. Where is the point of sale for an online purchase? The consumer's computer, the vendor's headquarters, the vendor's server, cyberspace generally? The Seventh Circuit didn't know the answer. So you think that term's ambiguous, too? Exactly. And it highlights the ambiguity. Thank you, Your Honor. All right. You have some time on rebuttal. All right. Mr. Gottlieb? Thank you, Your Honor. May it please the Court, Mike Gottlieb from Wilkie Farr on behalf of Navy Federal. I think the fundamental flaw in plaintiff's breach of contract theory is that their interpretation of the words made in and point of sale just can't be squared with what the Virginia Supreme Court has described as the, quote, holistic context of the words within the instrument. They have text arguments based on dictionary definitions, but none of them square with the context of the documents that explain what a transaction means. And this Court doesn't need to decide where all online sales transactions are made in the abstract. You need to look at how those terms and phrases are used within the account documents. And I think there are three themes that run through the account documents that plaintiffs really don't have an effective answer to. The first is that the debit card agreement distinguishes between the initiation of a transaction and the completion of a transaction. It does so expressly, as in Section 3C's discussions of how transactions are authorized, and it does so impliedly, as in Section 4's acknowledgment that the card can only be used with the merchant who accepts it, and Section 5's reservation that Navy Federal can decline an authorization if it believes that an initiated transaction might be unlawful or pose compliance risks. That section by itself proves that in the context of the account documents, it just cannot be the case that a transaction is made wherever a consumer clicks purchase. And the reason for that is Navy Federal can say no. Navy Federal can decline to authorize that transaction, and then the merchant is never paid, a transaction is never completed. The second is that the agreements are also clear that a member cannot only initiate or make a transaction, but also authorize a transaction to be made. Section 14 of the debit card disclosure recognizes that a member can challenge any transaction that, quote, you did not make or authorize. And that makes perfect sense, because these are agreements that talk about ATM transactions, where a consumer is physically placing a card into a machine, but also transactions that may occur at the point of sale, and we think we can talk about that. If I could interrupt you, Counsel. I mean, it sounds like what you're arguing is maybe if you look at Section or Paragraph 7 in isolation, you could interpret that in different ways. You may not concede that, but maybe theoretically that could be true. But any ambiguity that results from looking at that in isolation is resolved by other parts of the debit card disclosure document. Is that what you're saying? We don't think that the section is ambiguous, and we also don't think that you get to the point of determining ambiguity without considering the context of the document. You mean the context is in the, if the ambiguity or unambiguity is a line, it's above that line? Right. So in other words, if you were to read Section 7 and think to yourself, transactions using your debit card made in a foreign country, it's not obvious to me where that takes place. Before concluding it's ambiguous, you should first look through the rest of the document to make a determination of how the term is being used elsewhere. And I think that one section that I hadn't gotten to that I think is very clear on this is that Section 8, which appears immediately under Section 7 in the debit card disclosure, makes clear that a member's account statement will identify the, quote, merchant where transactions are made. And that, I think, is very clear in illustrating how Navy Federal's account documents think about transactions. Transactions occur under these documents where the merchant is, and that's because it is the merchant that is reporting to Navy Federal where the transaction has taken place and the transaction amount, the currency in which the transaction takes place, which makes sense given that these are international service assessment fees. All of that is provided to Navy Federal by the merchant, not where the consumer is. So can I ask you a question? Because it doesn't just say merchant, it also refers to financial institution as well. And so one of my questions, a big question I have about this case, is I understand your argument. You're saying that transaction, when we look at the full context, it's clear that the transaction is the original decision to make a purchase. It's this kind of complicated, multi-step exchange of funds and debits and credits. And I think that seems right to me, but I don't understand how that means that that complicated exchange of funds occurs inside the merchant's store. If the transaction is the processing of credits and debits, couldn't that also be made where the consumer's account is debited or where the merchant's account is credited or on the server that sort of runs the numbers? And why is any of that in the back of the store? We don't think it can under the context of the documents, in part because I think Section 8 is the only use of the phrase where transactions are made that makes clear it's where the merchant is. But also because throughout the account documents... But I'm sorry, how does it make clear it's where the merchant is? It says it will identify the merchant, financial institution, or electronic terminal and why isn't the... And you say it's on page 29 of your brief that the transaction is finalized when the merchant presents the transaction to Navy Federal for posting. So why doesn't... And then that transforms the hold into a credit. Why doesn't that happen at the financial institution where these accounts are being debited and credited? Because the exchange of funds for goods, if it's a goods transaction, will happen at the location of the merchant is the entity accepting the funds and shipping the goods. As just a logical matter, we think that's where it happens. But as a contextual matter, the reason that we think the account documents support that is because all of the action in the account documents that allow a service fee to be posted happen when a merchant transmits the data or posts the data to Navy Federal. So it is all of the action that determines when a fee can be assessed on a consumer for a transaction happens when the merchant acts. It happens when the merchant presents that information to Navy Federal. And so the merchant is the entity that is presenting the transaction, the exchange of goods to Navy Federal. Navy Federal then sends the money in order to effectuate that. What we know is it absolutely cannot be where the consumer is. And I think that's both because of the distinction between initiation and completion, but also because they don't really have any answer to the hypothetical that we pose in our brief both in the district court and here of a consumer placing an order online for a product and the merchant coming back and saying, sorry, we're out. We don't have any of it. The merchant has to be able to fulfill the order or the transaction. And they argue in their brief that there is a completed contract that is formed as between the consumer and the merchant and I think that's wrong as a matter of background contract law and UCC principles. We've submitted some authorities on that. But even leaving that aside, there's a distinction between a transaction and a contract for goods. So there's a lot of back and forth about the UCC and what the UCC means for sale of goods. We think we're right on the default principle there, but the complaint alleges not just a contract for the sale of goods. It has in it transactions that can take many forms. Our point is that transactions can take many forms. The transaction that is relevant for purposes of the assessment of an international service assessment fee is a transaction that occurs when a merchant is essentially charging a Navy Federal customer for goods or services that are procured in a foreign country. And the reason and rationale for that is because oftentimes they'll be denominated or be determined is by the location of the merchant that is making the determination. Since the Chang case was just raised a few days ago in this April 29th letter, do you have a response to opposing counsel's argument in that respect? Sure. I think what I just said is in part a response to that, which is that that entire debate is about what the UCC as incorporated into Virginia law means for the sale of goods. So first of all, we think that there's a distinction between a contract for the sale of goods and a transaction. There's also a distinction between a contract for the sale of goods and a contract for services, which this complaint includes. Even if you were to concede that they're right on the background legal principles, we don't think they are, but even if you were to concede it, they haven't alleged facts in their complaint that would support any of that, right? We're on a complaint and there's no allegation that there was a definite advertisement. There's no allegation that there was an offer that was only made with specific quantity and price details that only one consumer could accept. Because remember, the background principle, going back to Hornbook contract law, is that an advertisement isn't an offer, and the reason that an advertisement isn't an offer is because 1,000 consumers could claim that they accepted the offer on the spot, and then the merchant would have 1,000 or 999 breach of contract suits brought against them when they didn't have the good in stock. And so I guess the point is, even if you were persuaded that they've got the default rule right, they haven't alleged facts in their complaint that would support a finding of a breach of contract under that kind of a legal theory. And I think, linking it back to some of the questions that Judge Harris was asking, it's not a reasonable theory for determining under these contract documents where a transaction would take place. We've made the logical point that they haven't alleged facts in their complaint that would suggest maybe Federal even knows where a consumer is when an individual consumer is on their computer and clicks purchase. But if you take their argument to its logical extreme, another hypothetical we give that they don't have an answer to is it would mean, and I recognize the point of sale argument  but with respect to made in, their argument would mean that a U.S.-based consumer goes on vacation, and while they're on vacation, decides they're going to make some bill payments back, or they're traveling for business to a foreign country, they're going to make bill payments to a U.S.-based merchant. By their logic, that is a transaction made in a foreign country that you can assess an ISAF on. Now their answer to that is, well, that wouldn't be at the point of sale. And I should perhaps shift to that and address why we think that argument is incorrect. Can I just, this case sort of drives me crazy, and I think the reason is that this contract uses this kind of location-specific language, right, transactions made in a foreign country, for something that is happening in cyberspace, I guess is what you would call it, just something that doesn't actually have a tangible, physical location. And if you just ask somebody where an Internet transaction takes place, I mean, it could be nowhere, it could be anywhere. And so I, it just seems like it's a term that doesn't have any kind of definite or meaningful content when you apply it to cyberspace. How is somebody just looking at this language supposed to know the answer to this question? Do you know, and your colleague cited that Seventh Circuit case where the court goes on. It could be anywhere. It could be where you're sitting at your computer. It could be at the store. It could be at the bank. It could be up in the, up in the cloud. Like, how is it, where is the definite content for this kind of tangible location language when you're applying it in an intangible world? So we think the best answer to that is in the context of the documents and all the provisions that we just talked through. Because I think if you try to describe it in the abstract, it becomes a very thorny legal question that will suddenly apply well beyond the dispute in this case as to where an online transaction might take place. That might have a different answer in tax law. It might have a different answer for personal jurisdiction law. It might have a different answer for the UCC sale of goods. Those questions are way bigger than the question of this case, which is, how do you apply these terms within the context of these account agreements? And in the context of international slash foreign transaction fees, which is the title of the fee being assessed here, it's clearly an international fee. It crosses international borders and it's a foreign fee because the merchants are located in a foreign jurisdiction. And you get that context by working through all of the different provisions and understanding how the fees are assessed, in what order the transactions are placed on the account, and then in understanding the absurd results that would obtain if you followed the interpretation that the plaintiffs are reaching. I would also suggest, Judge Harris, that even if you look at, for example, they rely pretty heavily on the disclosures of other banks and they argue that those banks show that there's a contractual ambiguity. We actually think those run in the other direction because every example that they have of a bank that charges international or foreign transaction fees charges them under these circumstances. They may use different language. Every bank uses different language in how they describe the disclosures, but they don't have a single example thinking about industry practice. But there's a difference. Maybe I understand the argument, but it seems to me there's a difference    is to charge transaction fees like this and whether made in a foreign jurisdiction is to charge transaction fees like this and whether made in a foreign jurisdiction is to charge   and whether made in a foreign country is commonly understood to include that. I mean custom and usage is one thing you look at and I guess that's your point in that interpretive tool, but don't you look at what financial institutions, what other financial institutions do only back to my above the line below the line once you determine it's ambiguous? We completely agree with that Your Honor. I think you start with the text and we have competing dictionary definitions and we have an argument about how made in is used in the passive rather than the active course that I think they don't have a good answer to. Then you use the context of the documents to inform that text. We think that ends the analysis because we think the context is quite clear. My point is even if you were starting to think about how does a reasonable consumer in the abstract think about the meaning of these terms? What is an industry practice on the meaning of these terms? The only point I'm making is every other bank that charges foreign or international transaction fee charges them under these circumstances and the only difference is how they word the disclosure. I want you to talk about point of sale and I have the same question for you. If you are familiar with the concept of corpus linguistics and you have looked at that term with that doctrine or that interpretive tool in mind, you may not have this in your brief and that is fine. We haven't looked at it in the context of the point of sale term in this brief or the interpretation of the contract language here. I think our arguments about the meaning of point of sale are, first of all, point of sale does not appear in the debit card disclosure. It only appears in the schedule of fees, beginning with that principle. We think the  is an operative agreement. It purports to be an agreement. We argued below that the fee schedule, which is the document that has the point of sale language in it, we argued that they hadn't sufficiently alleged that was a binding contract. They said they had sufficiently alleged it as a binding contract because it was incorporated by the terms of this third document, the MSC disclosure. Our point and the argument that we have made is if you are going to incorporate the fee schedule as a part of the MSC disclosure all the way through it, the MSC disclosure is quite clear that point of sale is interpreted to mean debit card transactions. I'm just trying to make sure I understand your position or what you're willing to concede or not concede we look at in  contract. I understand you don't deny that the debit card disclosure that begins with this agreement is the contract. Correct. The statement of point of sale does not   If you look at the fees, the plaintiffs have alleged to be part of the contract. You contested that below. Is it your position that that is not part of the contract that we should consider? If we do, we have to consider the third document you are talking about? We are saying that the schedule of fees and this appears on page 22 of the joint appendix, if you look at it, it is a chart. It looks like this. Our position is that is not self-evidently a binding contract or agreement. It doesn't even have complete sentences in it. But if you are going to consider it a binding contract and agreement, the only reason it is is because there is a provision in the MSC disclosure that incorporates it by reference. If you look at that, our argument is it defines the term debit card transaction, also called point of sale. That definition essentially says when we say point of sale, we are saying debit card transactions. When we say point of sale, we  point of sale transactions. The only categories of fees that the document describes are current ATM and point of sale fees. To believe their interpretation that this document is only designed to refer to brick-and-mortar in- store purchases, you would think that somewhere else within these account documents, somewhere, there would be a reference to a distinction about in- store purchases versus online transactions, that that would be kind of an important theme that would run through the account documents. It doesn't appear anywhere. There's nowhere in the account documents where there's a reference to online transactions at all. And the only reasonable reading of this in light of that is that that definition, that point of sale and debit card are used interchangeably, it makes a whole lot of sense when you look at this document just on its face, even without considering the definition. But also... Yeah, another way to look at that, I mean, lump it. I mean, I think, maybe I'm wrong here, but ATM transactions tend to be done in person, don't they? Can you do an ATM transaction where you're not at an ATM machine? You could. So this is the active versus passive way, right? That's probably because I'm too old to know how to do that. Your spouse or your children or an agent of yours who could then make an ATM transaction on your behalf. You could authorize a person. But you've got to go to a machine somewhere and stick it in, right? Well, sure, but in the same way, you can use your debit card over the phone by calling in the number to a  If you were abroad, you could do that at home. You could also enter that information into a computer, which you could do at home or in the store. You could even enter the information electronically while physically at the location of the store given things like Apple Pay and iPhones and the ability to make transactions while you're walking around. And that's kind of the point. The point of sale is just the place where the sale happens. It is not, and that does not mean that you have to physically be present there at the moment that the sale or distinction runs, not just through our documents and the cases, but all the cases that they cite about the other federal statutory scheme. It also makes sense in that context where you're talking about handing a physical print receipt over to a consumer. We've made that point in our brief. Are there no more questions? All right.   from you again. Yes. I'd like to address the word transaction because that's the word Navy Federal focuses on. It's the word transaction. It's the word transaction. To consumers, the transaction occurs when the consumer clicks buy at their computer. And if I use my debit card to pay for groceries in the checkout line and I buy milk and diapers, that transaction happens in the checkout line. It doesn't happen three or four days later when the grocery store goes    milk is drunk. The diapers are used. This is the Roberts versus Capital One transaction. This is the Roberts versus Capital One transaction. This is the Roberts versus Capital One transaction.  Roberts versus Capital One transaction. It's also demonstrated by Navy Federal's own contract which says Posting is payment. Posting is the settlement of a debit card transaction. And so in this sentence, the transaction is made prior to posting. They have to be two separate points of time. Otherwise, you'd be reading the word will out of that sentence and rendering that word superfluous which goes against contractual principles. To address a couple of their hypotheticals, they say, what happens if the merchant is sold out? Is that a transaction? We all know how the internet works. If you actually go to click buy, your card will be charged right away. If that product ends up being sold out, you'll get a refund. But the transaction still happened. It might be a canceled transaction. It might be a refunded transaction. But to the consumer, there was still a transaction. And to your point, Judge Harris, if the transaction could reasonably be construed as occurring in multiple places, if it could be construed as occurring in the consumer's home or where the merchant is located or in cyberspace or the cloud generally, then that highlights the ambiguity and the motion to dismiss should have been properly denied if there are multiple reasonable interpretations for where this transaction could have been made. They also try to kind of disclaim their fee schedule as not a contract, which is very odd for a bank or credit union to do because it's the only place that actually lists how much they're going to charge. So by that logic, they're not bound by the fees that they list on there and they could charge the merchant whatever they wanted, even if it's not listed in the fee schedule, which just as a practical matter is not how banking works. It's very clearly a contractual document and I would argue the most important contractual document because it's the one that consumers are handed as the  that they're going to be assessed. It's supposed to be a clear, easily digestible listing of fees. And I think they're going to be I think their last hypothetical has to do with what happens if a consumer purchases a transaction while they're away somewhere else located abroad. First of all, the fact that we can come up with so many hypotheticals and what's supposed to happen again highlights the ambiguity. But I would go back to our interpretation of this contract, which is a reasonable interpretation, is that you can only charge this fee when the consumer is located abroad and physically standing in a foreign country, which is a fact that Discovery will reveal. Navy Federal does know. They know when the card is with the purchaser and when the card is not with the purchaser. So this is an entirely enforceable interpretation of the contract and it is one that other banks and credit banks can't enforce. Unless you have any further questions. No, thank you. Thank you both for your arguments. You clearly each know your cases very well and we appreciate that. Thank you, Ms. Gold, for traveling across the country to be here to argue today and safe travels, Mr. Gottlieb, and I hope to see you back up on 95. That can be treacherous.
judges: Stephanie D. Thacker, Pamela A. Harris, A. Marvin Quattlebaum Jr.